**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **NEW YORK LIFE INSURANCE CO.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 19 C 2269** |
| | ) | |
| **BARBARA J. PETERS and** | ) | |
| **DAIMON E. HILL, individually** | ) | |
| **and as independent executor** | ) | |
| **of the estate of Swinter E. Hill,** | ) | |
| | ) | |
| **Defendants-Claimants.** | ) | |

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

MATTHEW F. KENNELLY, District Judge:

The passing of a loved one is nearly always very difficult for surviving family members. It can be even more difficult if the loved one has, before passing, made decisions on important matters without telling family members. In this case, the Court is called upon to deal with exactly this type of difficult situation.

The case involves a dispute over entitlement to the death benefit under a life insurance policy purchased by Swinter Hill. The competing claimants are Daimon Hill (Swinter's son) and Barbara Peters. A bench trial involving the claimants was held on January 10, 2020. This constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a)(1).

Because several of those involved in this case have the last name Hill, to avoid confusion the Court will refer to Swinter Hill, Daimon Hill, and Daimon's wife Sonji Hill by

their first names.  The Court will refer to Barbara Peters by her last name and her son Cornelius Peters by her first name.

1.    **Findings of fact (part 1)**

In 1995, Swinter Hill he purchased a life insurance policy from New York Life Insurance Company with a death benefit of $20,000.  The original primary beneficiary was Swinter's wife, Shirley Hill, with his children, Daimon Hill and Cassandra Carr, as secondary beneficiaries.  In 2002, Swinter designated Daimon Hill as the primary beneficiary and his stepdaughter Frances Carr as secondary beneficiary.  On February 22, 2018, Swinter designated Barbara Peters, identified as his fiancée, as the sole beneficiary under the policy.

Swinter died on April 4, 2018.  On May 9, 2018, Peters submitted a claim for the death benefit under the insurance policy.  On June 28, 2018, an attorney representing Swinter's estate and Daimon advised New York Life that he was investigating possible financial exploitation of Swinter by Peters.  On August 14, 2018, Daimon asserted a claim to the insurance policy's death benefit and followed this up with a written allegation of fraud and other wrongdoing by Peters in connection with Swinter's designation of her as the beneficiary.

Because of the dispute over the insurance proceeds, New York Life filed an interpleader suit in this district, naming Peters and Daimon as the respondents.  New York Life was permitted to deposit the insurance proceeds into the registry of the Court and was then dismissed as a party, leaving Peters and Daimon to fight out the question of entitlement to the proceeds.  Daimon in effect asserted a crossclaim against Peters seeking a ruling invalidating Swinter Hill's designation of her as the beneficiary of his life

2

insurance policy. Daimon appeared *pro se*, and Peters appeared by counsel. The Court allowed three months for the parties to conduct discovery. After come intervening events that the Court will discuss shortly, it set the case for a bench trial in January 2020 (no party had filed a jury demand).

About three weeks before the trial date, Daimon moved to hold Peters in default as a sanction for failure to respond to certain written discovery requests he had served on Peters's counsel. After getting Peters's response, the Court decided to reserve ruling on the motion for sanctions and proceed with the bench trial. The Court will take a short detour at this point to deal with the motion for sanctions and then will continue with its findings and conclusions regarding the bench trial.

## 2.     Motion for sanctions

After the interpleader suit was filed, Peters retained counsel here in Chicago. Daimon Hill, who lives in Arkansas, made it clear in several status hearings with the Court—in which he appeared by telephone—that he did not intend to retain counsel. As indicate earlier, the Court set a 90-day discovery deadline, ordering the completion of discovery by November 5, 2019, and explained to Daimon during a status hearing the nature and forms of discovery that he could take.

Peters's counsel, Gwendolyn Bayless, did not serve any written discovery requests on Daimon. And Bayless did not appear at court-ordered status hearings on October 9 and October 22, 2019, the latter even after the Court had entered an order directing Peters and Bayless to show cause why a sanction should not be imposed due to Bayless's non-appearance at the October 9 status hearing. As a result, on October

22, the Court held Peters in default due to counsel's failures to appear. This apparently got the attention of Bayless, who filed a motion to vacate the default order.

On November 18, 2019, the Court granted Peters's motion to vacate the order of default. On that same date, given the straightforward nature of the dispute, the Court also set the case for a bench trial in January 2019. Daimon Hill also advised the Court on November 18 that Peters had failed to respond to his discovery requests. The Court said that he could file a motion for sanctions.

On December 13, Daimon filed a motion for sanctions, seeking to hold Peters in default for her failure to respond to his discovery requests, specifically a set of interrogatories that he had served upon Peters's counsel. The Court has considered the motion and Peters's response. In the response, attorney Bayless concedes that she received the interrogatories and does not contend that Peters responded to them. Rather, counsel contends Peters was not required to do so because there were 54 interrogatories and they were not signed. Federal Rule of Civil Procedure 33 limits a party to "no more than 25 written interrogatories, including all discrete subparts." Fed. R. Civ. P. 33(a)(1). And Rule 26 says that a party has "no duty to act on an unsigned . . . request . . . until it is signed, and the court must strike it unless a signature is promptly supplied after the omission is called to the attorney's or party's attention." Fed. R. Civ. P. 26(g)(2).

Peters forfeited both of these objections by failing to make them in a timely fashion. First, she did not call to Daimon's attention the proposition that his interrogatories were not signed—which is what the rule requires before a court may strike an unsigned discovery request. That aside, it is not all that obvious that the

4

interrogatories were "unsigned." The Rules are not exactly a model of clarity when it comes to defining what constitutes a signature by an unrepresented person, particularly on a document like a set of interrogatories that not only is not required to be filed but in fact may not be filed. *See* Fed. R. Civ. P. 5(d)(3), 11(a), 26(g)(1). Seeing as how the purpose of a signature on a discovery request is to verify that it was issued by the party or attorney and to make the certifications under Rule 26(g)(1)(B)(i)-(iii), the Court finds that the sending of these requests from an e-mail address associated with Daimon Hill and their acknowledged receipt by Peters's counsel (who repeatedly communicated with Daimon about the case via the same e-mail address), *see* Dkt. No. 34, pages 3 of 9, 7 of 9, satisfies the signature requirement.

As for the excessive number of interrogatories, this, too, is a waivable or forfeitable objection. Indeed, the Rule permits service of more than 25 interrogatories if the parties agree. Fed. R. Civ. P. 33(a)(1). If a party objects to an interrogatory, it must state the objection "with specificity," and "[a]ny ground not stated in a timely objection is waived unless the court, for good cause, excuses the failure." Fed. R. Civ. P. 33(b)(4). Peters served no objections to the number of interrogatories, nor did she answer, for example, the first 25. Instead, she said and did nothing until she was called on the carpet via the motion for sanctions. That was not soon enough; Peters waived or forfeited the objection.

It remains for the Court to determine whether to impose a sanction due to Peters's and her counsel's failure to answer Daimon's interrogatories. Under Federal Rule of Civil Procedure 37(d), a court may order sanctions if a party properly served with interrogatories fails to serve answers, objections, or a written response. Fed. R.

Civ. P. 37(d)(1)(A)(ii).  The Court notes that a failure to answer "is not excused on the ground that the discovery sought was objectionable," unless the party has served a motion for protective order, *see* Fed. R. Civ. P. 37(d)(2), which Peters did not do. Sanctions may include, among other things, directing matters to be taken as established for purposes of the case, prohibiting the disobedient party from making certain contentions, or rendering a default judgment.  Fed. R. Civ. P. 37(d)(3), citing Fed. R. Civ. P. 37(b)(2)(A)(i)-(vi).  Instead of or in addition to these sanctions, the court "must require" the party failing to act—or the attorney advising that party—to pay the requesting party's expenses caused by the failure, "unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(3).  A court has wide discretion in determining an appropriate sanction.  *See, e.g., Patrick v. City of Chicago*, 974 F.3d 824, 831 (7th Cir. 2020); *Greyer v. Ill. Dep't of Corrs.*, 933 F.3d 871, 877 (7th Cir. 2019).

Daimon requests entry of a default judgment, but "[d]efault judgment is strong medicine for discovery abuse.  It is appropriate only where there is a clear record of delay or contumacious conduct, where other less drastic sanctions have proven unavailing, or where a party displays willfulness, bad faith, or fault."  *Domanus v. Lewicki,* 742 F.3d 290, 301 (7th Cir. 2014) (internal quotation marks and citations omitted).  There was no such pattern here.  It is true that Peters's attorney missed two status hearings, but that does not amount to "a clear record of delay or contumacious conduct," even when considered along with the failure to respond to the interrogatories. Indeed, on the failure to respond, it is quite clear that the noncompliance (like the non-appearances) is the fault of Peters's attorney, not Peters herself.  Under the

6

circumstances, the Court does not believe that entry of default against Peters or any other merits-related sanction, such as a contention-preclusion order, is appropriate.

The failure of Peters and Bayless to serve responses to Daimon's interrogatories deprived him of timely access to information. If Bayless had objected on the ground that Daimon had served too many interrogatories, the Court would have required him to limit them to 25 or perhaps a few more than that, but Peters still would have had to answer them before the bench trial. This would have allowed Daimon a greater chance to prepare and, perhaps, to pursue a resolution of the case prior to trial. That said, Daimon had the opportunity to question Peters at the bench trial, and he does not specify any documentary or other information that he might have been able to introduce if Peters had responded to his interrogatories (or to a shortened version of them) in a timely fashion.

Turning to Peters's attorney Bayless, it is apparent that she chose to participate in the proceedings only when she considered it advantageous to her and her client. She ignored status hearings, taking action only after the Court imposed a default sanction on her client. And she chose to ignore Daimon's written discovery until after her client was threatened with sanctions. As the Court indicated, the fault here does not lie with Peters. Instead, it lies with her attorney.

Based on attorney Bayless's noncompliance, the Court imposes upon her a monetary sanction of $3,000, payable to Daimon Hill within 10 days after entry of this order. The Court finds that this amounts to fair compensation for the impairment of Daimon's ability to prepare for trial caused by counsel's noncompliance. This amount

must be paid by Bayless and may not be billed to, charged to, or debited against her client. Daimon's motion for sanctions [34] is otherwise denied.

3.      **Findings of fact (part 2)**

The Court returns to its finding of fact. At the bench trial, held on January 10, 2020, four witnesses testified: Daimon Hill, his wife Sonji Hill, Barbara Peters, and her son Cornelius Peters. The parties also introduced a number of exhibits. The Court will make these exhibits part of the record, but under seal because they include personal identifying information.

Swinter Hill's health began to decline around 2011. At some point he was diagnosed with stomach cancer, but he evidently recovered or at least was believed to have recovered. He lived on his own in Chicago.

Daimon was Swinter's only biological child. Through December 2017, Daimon and Sonji lived in Westchester, a suburb of Chicago. Daimon owned a barbershop in Oak Park. Daimon's relationship with Swinter had been a bit strained, but it improved and became what Daimon and Sonji both described as a good relationship. Daimon communicated with Swinter on a regular basis.

Peters, a retired nurse, met Swinter in 2016 at a community center where she taught crafts. She became his girlfriend at some point. She testified that Swinter eventually asked her to marry him and that she agreed, but there is no evidence that a date for a wedding was ever set.

Swinter had a stroke in October 2017 while at Peters's home. Peters took him to the hospital. Swinter called Daimon from the hospital to tell him what had happened. The stroke caused Swinter some left-side paralysis. After this, he could not walk

8

unassisted and had difficulty using his left hand. His speech was somewhat slurred as well. The testimony did not suggest, however, that his mental functioning was impaired, at least not in a significant way.

After the stroke, Swinter remained in the hospital for between one and two weeks and then was transferred to a rehabilitation facility, where he stayed for three to four weeks before being readmitted to the hospital in December 2017 for reasons not disclosed in the record. He was then released to a different rehabilitation facility, where he remained until late December. During the period of hospitalization and convalescence, Daimon saw Swinter at leave five times weekly, and Sonji saw him a little less than this.

After his release from the rehabilitation facility in December 2018, Swinter returned to his home. Peters testified that she was with Swinter constantly after that. All witnesses agreed that Peters provided a significant amount of care for Swinter. She testified that she bathed and fed him and cleaned his clothes. He spent some of his time at his own home and some of his time at hers. Swinter had been able to manage his affairs entirely by himself before the stroke, but not after. Daimon testified that Peters assisted him in this regard after the stroke. Daimon had a power of attorney from Swinter but did not exercise it, he said, because Swinter did not ask him to do so.

Daimon and Sonji testified that after Swinter's stroke and during his recovery period, he told them that he wanted to move away from Chicago and live out the rest of his days in a warmer place that he could afford on his fixed income. Daimon and Sonji discussed this and agreed to sell their home in Westchester, as well as Daimon's

9

barbershop in Oak Park, and move to Florida. The plan was for Swinter to move there and live with them once he was physically able to do so.

Daimon and Sonji rented a two-bedroom home in St. Petersburg, Florida. A few days before their relocation, they were in an automobile accident, and Daimon was injured. They moved to Florida as planned, but the accident, the injury, and resulting physical therapy impaired Daimon's ability to come back and forth from Florida to Chicago. Daimon and Sonji did not see Swinter between mid-December 2017 and his death on April 4, 2018. Daimon did have at least some contact with Swinter by telephone during this period.

Peters testified that in December 2017, while in the rehabilitation facility and when Daimon was in the process of moving to Florida, Swinter told her that he was "going to change things." He said that he didn't think Daimon was coming to see him enough. He did not explain further what he meant by "chang[ing] things," but it is clear from Peters's testimony that she understood Swinter to be referring to financial matters.

Peters testified that at some point during the period when Swinter was in the rehabilitation facility, he told her that he did not want to move to Florida. She testified that she encouraged him to contact Daimon and tell him this. She did not testify, however, that Swinter ever did so. Daimon and Sonji did not indicate any awareness of Swinter's purported unwillingness to move to Florida.

In February 2018, Peters had surgery and was hospitalized. Prior to this, Swinter told her that he had contacted Daimon and other relatives, but none of them were able to come to Chicago to look after him while Peters was in the hospital. Peters enlisted a cousin of hers to assist with Swinter during this period.

10

As indicated earlier, Swinter executed a change-of-beneficiary document for his life insurance in mid-February 2018, replacing Daimon with Peters as the primary beneficiary of the New York life policy. He said nothing to Daimon about this; Daimon learned about it only after Swinter's death. At some point in February 2018, Peters testified, Swinter gave her a copy of a letter from New York Life confirming the change of beneficiary. *See* Peters Exhibit 1. The letter's date is obscured by a CM/ECF header, but it says that the effective date of the beneficiary change is February 22, 2018, and it identifies Peters as Hill's "fiancé" [sic]. Peters testified that she asked Swinter why he had done this and remarked that Daimon would be angry; she stated that Swinter replied with, essentially, a so-what. Peters said she was unaware of the amount of the life insurance death benefit until after Swinter died.

Peters's son Cornelius testified that in February 2018, he took Peters and Swinter to US Bank, and Swinter had her added as a joint owner of his bank account there. Peters likewise testified that this happened in February, "around the same time that [Swinter] had put me on that [insurance] policy," which as indicated is documented to have taken place in February. This testimony was quite plainly incorrect, as shown by the documentary evidence. The US Bank signature card reflects that Peters was added to the account on April 2, 2018, just two days before Swinter's death. When confronted with this inconsistency during the trial, Peters initially suggested, quite implausibly, that the bank had changed the date. In any event, the account statements also support an early-April timing for the addition of Peters to the account: the February 15, 2018 and March 15, 2018 bank statements list him as the only account holder, *see* Court's Exhibits 1 and 2, whereas the April 16, 2018 bank statement shows both

11

Swinter and Peters as the holders of the account.  *See* Peters Exhibit 6.  This indicates that the addition of Peters as an account holder took place between March 15 and April 16.[1]  The Court finds that, as the signature card reflects, Peters was added to the account on April 2, 2018, two days before Swinter died.

Peters testified that in March 2018, she and Swinter attended a funeral.  After the funeral, Swinter told her that he wanted to be cremated and said he was going to call the same funeral home to make arrangements.  According to Peters, however, Swinter "got sick" before he could go to the funeral home for a meeting, so he asked her to contact the funeral home.  A representative from the funeral home came to see Swinter and Peters.  On March 20, 2018, Swinter signed a power of attorney authorizing Peters to make funeral arrangements for him.  *See* Peters Exhibit 2.

During her direct examination, Peters testified that Swinter entered into an agreement with the funeral home and told her to withdraw money from his account and pay for it right away.  This, too, appears to be incorrect.  The funeral purchase contract is signed not by Swinter but by Peters—presumably pursuant to the power of attorney— and it is dated April 6, 2018, two days after Swinter's death.  It sets a price of $1,061.

Peters testified that Swinter's death came as a surprise.  He "seemed okay" on April 2-3, she stated.  On April 3, he asked her to take him to see his doctor.  Peters testified that she drove Swinter to Elmhurst Hospital on April 4 to see a doctor.  Her son Cornelius testified that he went to Swinter's home around midday, and Swinter was not feeling well.  He put Swinter into Peters's car and followed them to the hospital.

---

[1] The record also reflects that Swinter issued a check from the account to Peters on March 5, 2018 for $1000, which would not have been necessary if Peters had already been on the account by that date.  *See* Court Exhibit 1, p. 2.

According to Peters, Swinter passed out in the car on the way there. He was pronounced dead upon their arrival at the hospital, at or about 2:00 p.m.

Peters contacted Daimon by phone and told him that Swinter had died. Daimon and Sonji immediately traveled to Chicago. A dispute arose when they went to the funeral home to see Swinter's body. They claim they were not permitted to see Swinter and say that the funeral home operator told them that Peters had instructed him not to allow them to see the body. Peters denies giving any such instruction. The Court need not delve into this further, however, as the dispute is immaterial to the lawsuit.

Sonji testified that after visiting the funeral home, she and Daimon went to Swinter's house. Sonji testified that the home was in disarray, there was spoiled food in the kitchen, and the home smelled of urine. She testified that Peters told her and Daimon that Swinter had been defecating on himself for three to four weeks but had not told anyone. By contrast, Cornelius Peters testified that Swinter's home was in good shape and that his mother kept it cleaned up.

Sonji and Daimon also testified that despite Peters being on Swinter's bank account, presumably to help him manage his finances, she had not paid a number of his bills. They testified that they paid these bills after Swinter's death. The Hills introduced no documents to support this testimony, however.

The evidence also includes certain records for Swinter's bank account at US Bank. The bank statements, some of which appear to be incomplete copies, reflect that deposits into the account exceeded withdrawals for the periods ending on February 15 and March 15, 2018—when Swinter was the only named account holder. The bank statement for April 15, however, reflects repeated withdrawals from the account and

13

apparent use of a debit card to make purchases, starting a day or two after Swinter's death. These withdrawals and purchases were made by Peters, with one exception noted below. There is a withdrawal of $1,000 on April 4; Peters testified that this was to pay for Swinter's funeral. There are ATM withdrawals of $500 each on April 6, April 9, and again on April 9; a withdrawal of $1,000 on April 12; and withdrawals of $2,000 on April 18, $2,000 on April 26, and $1,000 on May 3—all made by Peters. In addition, there are repeated uses of a debit card for purchases starting on April 10, including a number of purchases in Ohio on April 23-24, 2018. Peters testified that she withdrew money from the account "because [Swinter] had left the bank account in my name"— essentially because she considered it her money. She also claimed that Swinter told her before his death (no date was specified) to "clear the bank account out." The Court notes some inconsistency between this claim and the fact that the balance in the bank account dropped only about $5,000 from the date of Swinter's death to April 24, three weeks later. It appears, however, that by June 15, the account—which held $23,556.28 on the date of Swinter's death, *see* Peters Exhibit 6, p. 2—had been reduced to a zero balance. *See* Court Exhibit 3. At least one of these withdrawals, though, was made by Daimon, through means that are not entirely clear. On the advice of his and the estate's attorney, Daimon evidently transferred $10,000 (or perhaps a bit more) from the account, for the stated purpose of preventing Peters from draining the account completely: both Daimon and Sonji so testified.

**4. Conclusions, including conclusions of law**

The evidence appears to reflect some financial shenanigans by Peters in the days surrounding and following Swinter Hill's death. First of all, there is evidence to

14

suggest that she got herself added to Swinter's bank account under suspicious circumstances. She and her son testified this took place in February, but the evidence shows it actually happened on April 2, 2018, just two days before Swinter's death. In addition, the evidence is clear that beginning on the day Swinter died, Peters determined to take or use the money that remained in the account. The circumstances surrounding the funeral arrangements are also not explained in a satisfactory way. Peters claimed during her testimony that the arrangements were set up and paid for before Swinter died, but the documentary evidence indicates otherwise. And all of this occurred during a period when Swinter was in poor health, convalescing, and was impaired—at least physically if not mentally—and was also seemingly more or less dependent on Peters.

The issue in this case, however, is not whether Peters, Daimon Hill, or neither of them was entitled to the money that Swinter Hill still had in his bank account at the time of his death. Rather, the lawsuit concerns the New York Life insurance proceeds. None of the evidence of financial shenanigans occurring in April 2018 has any direct bearing on Swinter's changing of the beneficiary designation on his New York Life policy in February 2018. There is no direct evidence that Swinter removed Daimon and replaced him with Peters under duress, due to undue influence, or while impaired. Indeed, although Swinter was certainly *physically* impaired in February 2018 due to his October 2017 stroke, no party offered evidence that would have tended to show that he was *mentally* impaired at that time in a way that would have prevented him from exercising his own judgment. There is certainly nothing inherently implausible about the idea that Swinter might have wanted to show gratitude toward Peters for taking care of

15

him or for her companionship generally. In addition, there is nothing inherently implausible in the notion that he might have, at that point, felt closer to Peters than to Daimon, who had moved to Florida (for good and valid reasons) and was not in regular contact with him.

The argument can be made that Peters's apparent financial defalcations vis-à-vis Swinter's assets at or around the time of his death gives rise to an inference that the change-of-beneficiary designation was executed under similarly suspicious circumstances. On the record before the Court, however, this would not be a reasonable inference—rather, it would be entirely speculative. No evidence introduced at trial indicates that Peters coerced or deceived Swinter into making her the beneficiary on his life insurance or that she in any way exercised undue influence on him in making that designation.

From a legal standpoint, Swinter Hill was entitled to change the beneficiary on his life insurance policy if he wanted to, even if this was based on a whim. *See, e.g., Schultz v. Schultz*, 297 Ill. App. 3d 102, 108, 696 N.E.2d 1169, 1173 (1998); *Perkins v. Stuemke*, 223 Ill. App. 3d 839, 842, 585 N.E.2d 1125, 1127 (1992). Daimon Hill, though previously designated as primary beneficiary, had no vested entitlement to those benefits as of the date that Swinter removed him as primary beneficiary and replaced him with Peters.

The only viable theory upon which Daimon can pursue a claim to the insurance proceeds is via imposition of a constructive trust. A constructive trust is "an equitable remedy imposed against one who, by some form of wrongdoing such as actual or constructive fraud, breach of a fiduciary duty, duress, coercion, or mistake, has been

16

unjustly enriched." *Schultz*, 297 Ill. App. 3d at 106, 696 N.E.2d at 1173. Under the law, however, the basis for imposing a constructive trust "must be so clear, convincing, strong and unequivocal as to lead to but one conclusion." *Suttles v. Vogel*, 126 Ill. 2d 186, 194, 533 N.E.2d 901, 905 (1988). That is not the case here. There is no evidence that Peters defrauded Swinter Hill into making her the beneficiary of his life insurance policy or, that there was any duress or coercion on her part or mistake on Swinter's part. An argument can be made that as a caregiver, Peters had a fiduciary relationship with Swinter, but this would not amount to a basis to undo Swinter's decision to make her the beneficiary of his life insurance. It would at most give rise to a *presumption* of fraud based on Peters's benefitting from the relationship, and here any such presumption has been rebutted with evidence that Swinter acted of his own free will and with a desire to thank, or perhaps compensate, Peters for her caregiving and companionship.

For these reasons, the Court concludes that there is no basis to invalidate Swinter Hill's February 2018 designation of Barbara Peters as the beneficiary of his life insurance policy issued by New York Life Insurance Company.

### Conclusion

Attorney Gwendolyn Bayless is ordered to pay claimant Daimon Hill $3,000 within ten days of entry of this order, as a sanction for her noncompliance with discovery requests. Bayless is ordered to certify her compliance with the sanctions order by a filing on the record no later than February 5, 2021. Daimon Hill's motion for sanctions [34] is otherwise denied. The Clerk is directed to enter judgment stating as follows: The claim of Barbara Peters to the proceeds of Swinter Hill's New York Life insurance policy is sustained, and the claim of Daimon Hill (individually and as executor of Swinter

17

Hill's estate) to the proceeds of the insurance policy is overruled. Peters's attorney is directed to promptly prepare and submit to the Court, by no later than January 27, 2021, a draft order consistent with this decision directing the Clerk to pay to Peters the amount on deposit in the Court's registry related to this case. The proposed order should be filed on the docket, and a Word version must be submitted to Judge Kennelly's proposed order e-mail address pursuant to instructions that may be found on Judge Kennelly's web page.

Date: January 22, 2021

_____
MATTHEW F. KENNELLY
United States District Judge